IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARLOW JORDAHL, :
:
    Plaintiff(s) :
: Case Number: 1:01cv862-SJD
vs. :
: District Judge Susan J. Dlott
WATLOW ELECTRIC MFG. CO., :
:
    Defendant(s) :

JUDGMENT IN A CIVIL CASE

Decision by Court: This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

... that the motion for summary judgment is GRANTED.

9/29/04                                                              JAMES BONINI, CLERK

                                                                                  __s/Stephen Snyder_____
                                                                                  Deputy Clerk

Pursuant to S. D. Ohio Civ. R. 79.2(a) and (b), all models, diagrams, depositions, photographs, x-rays and other exhibits and materials filed or offered in evidence shall be withdrawn by counsel without further Order within six (6) months after final termination of the action. All materials not withdrawn shall be disposed of by the Clerk as waste.



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Marlow Jordahl | : | |
| | : | Case No. C-1-01-862 |
|        Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING |
| Watlow Electric Manufacturing Co. | : | DEFENDANT'S MOTION FOR |
| | : | SUMMARY JUDGMENT |
|        Defendant | : | |

This matter comes before the Court on Defendant Watlow Electric Manufacturing Co. ("Watlow")'s Motion for Summary Judgment (doc. #20). Plaintiff Marlow Jordahl alleges that Watlow misclassified him as an independent contractor rather than an employee and now owes him pension benefits for the twenty-three years that he worked while classified as an independent contractor. Watlow contends that Jordahl's claim is time-barred. For the reasons set forth below, Watlow's motion is **GRANTED**.

I.    **FACTUAL BACKGROUND**

Watlow hired Plaintiff Marlow Jordahl as an employee in St. Louis in 1973. (Jordahl depo. at 27.) Jordahl received a W-2 for that year of employment. (Id.) In April of 1974, Jordahl moved to Cincinnati, where he assumed the duties of district manager for the greater part of Kentucky and Indiana and southwest Ohio. (Id. at 29-30.) When he began work in the tri-state territory in April of 1974, Jordahl signed a contract with Watlow stating that he was an

1

independent contractor. (Id. at 47.) Jordahl was classified as an independent contractor for the full twenty-three years that he worked as a sales person in the tri-state territory. (Id. at 44-45. For an example of the contract, see Jordahl depo. exhs. 1 and 2.)

In 1973, while Jordahl was classified as an employee, Watlow made contributions toward his pension benefits. (Id. at 82-83.) After Jordahl signed the contract classifying him as an independent contractor, Social Security was not deducted from his paycheck, and Watlow ceased contributing toward Jordahl's pension benefits. (Id. at 63.) Jordahl did not notice at the time (id.), but he spoke with the then comptroller of Watlow about his employment status, insurance, and Social Security. (Id. at 85.) Jordahl no longer remembers what the comptroller told him, but Jordahl also discussed pension benefits and employment classification with his then accountant in 1975, in preparation for filing his 1974 income tax returns. (Id. at 88-89.) Jordahl's accountant explained to him that because of his independent contractor classification, he had to pay his own Social Security; Jordahl also learned about paying payroll taxes and not receiving pension benefits at that time. (Id. at 90-91.) In 1985, Jordahl began contributing for his retirement to a Keogh Plan, a plan available only to those who are self-employed. (Jordahl depo. exh. 39.) He filed his income tax returns as a sole proprietor at least as late as 1996. (Jordahl depo. exh. 23.)

In 1997, Jordahl returned to an in-house position with Watlow (Jordahl depo. at 118), and he was again designated as an employee and began receiving W-2s. (Id. at 122.) Watlow terminated Jordahl in 2001 and originally informed him that he was ineligible for pension benefits since he had worked as an employee for less than five years. (Doc. #23, exh. C.) A month later, the HR specialist at Watlow informed Jordahl that, taking all of his hours into

account, he had enough hours to satisfy the five year vesting requirement and thus was eligible for pension benefits under the Watlow Group Pension Plan. (Id., exh. D.) Jordahl now brings suit against Watlow under 28 U.S.C. § 1132 of the Employee Retirement Income Security Act of 1974 ("ERISA"), claiming that Watlow misclassified him as an independent contractor for twenty-three years and that he is entitled to pension benefits for those years of service.

## II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III.   ANALYSIS

ERISA does not provide a statute of limitations for claims to recover past pension benefits. Such claims are governed by the most analogous state statute of limitations, which is that for breach of contract. Santino v. Provident Life and Accident Ins. Co., 276 F.3d 772, 776 (6th Cir. 2001). The parties dispute whether Ohio's fifteen year or Missouri's ten year statute of

3

limitations for breach applies.[1] Notwithstanding which state contract limitations period applies and notwithstanding whether Jordahl was, in fact, misclassified as an independent contractor, Jordahl's claim is time-barred because all possible statutes of limitations have run.

Although the statute of limitations is borrowed from state law, federal law governs when an ERISA claim accrues. See Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund v. Muir Co., Inc., 992 F.2d 594, 598 (6th Cir. 1993). Generally, an ERISA claim for benefits does not accrue until a claim for benefits has been made and denied. See e.g. Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund, 979 F.2d 444, 451 (6th Cir. 1992). Such a claim may accrue before that, however, when there has been a "repudiation by the fiduciary which is clear and made known to the beneficiary." Morrison v. Marsh & McLennan Companies Inc., 326 F. Supp. 2d 833, 841 (E.D. Mich. 2004). Federal courts traditionally apply the discovery rule in such a context. Mounts v. Grand Trunk Western R.R., 198 F.3d 578, 582 n.3 (6th Cir. 2000); Michigan United Food Workers, 992 F.2d at 597-98. Under the discovery rule, "a claim accrues and the limitations period begins to run when the plaintiff discovers or with due diligence should have discovered, the injury that is the basis of the action." Michigan United Food Workers, 992 F.2d at 597 (quoting Connors v. Hallmark & Son Coal Co., 935 F.2d 336, 341 (D.C. Cir. 1991) (internal quotations omitted)).

---

[1] Jordahl's 2001 employment contract with Watlow contains a choice of law provision specifying that Missouri law applies to the contract. (Jordahl depo. exh. 3 at 3 ¶ 5.) Ohio's statute of limitations for breach of contract is fifteen years. Ohio Rev. Code § 2305.06. Missouri's statute of limitation for breach of contract is ten years. Mo. Ann. Stat. § 516.110(1).

4

Jordahl argues that his claim did not accrue until November of 2001,[2] when Watlow informed him that he was credited for only five years of service. Jordahl contends that Watlow's misclassification is a continuing violation that functions to toll the statute of limitations and that starting the clock from Jordahl's understanding of the ramifications of his independent contractor status is unfair because few people focus on their pension benefits at the beginning of their career. There is no Sixth Circuit authority indicating that a longstanding misclassification constitutes a continuing violation of ERISA so as to toll the statute of limitations, and several courts have explicitly held otherwise in other ERISA contexts.[3]

Watlow argues that Jordahl discovered or with due diligence should have discovered his alleged employment misclassification in 1975 when he first discussed the matter with his

---

[2] Jordahl also argues that November 2001 is the appropriate accrual date because an ERISA cause of action accrues when a claim for benefits has been made and denied and Watlow essentially denied Jordahl benefits at that time. Watlow correctly notes that Jordahl has not filed a claim for benefits under Watlow's pension plan nor has he named Watlow's plan as a defendant in this action. Any argument that Watlow's November 2001 letter constitutes a formal denial of benefits must fail because Jordahl has never made a claim.

[3] See Downes v. JP Morgan Chase & Co., No. 03 Civ. 8991, 2004 WL 1277991, *4 n.6 (S.D.N.Y. June 8, 2004) (relevant breach or violation is plaintiff's misclassification, fact that its effects continued to be felt over a period of time does not render wrongful act a continuing violation) Edes v. Verizon Communications, Inc., 288 F. Supp. 2d 55, 61-62 (D. Mass. 2003) (continuing breach does not extend statute of limitations under a continuing violations theory); Schultz v. Texaco Inc., 127 F. Supp. 2d 443, 447 (S.D.N.Y. 2001) (same); Phillips v. Alaska Hotel and Rest. Employees Pension Fund, 944 F.2d 509, 520 (9th Cir. 1991) (finding that if a series of "breaches are of the same kind and nature and the plaintiff had actual knowledge of one of them more than three years before commencing suit, § 1113(a)(2) bars the action"); Pisciotta v. Teledyne Indus., Inc., 91 F.3d 1326, 1332 (9th Cir. 1996) (declining to apply continuing violations theory in ERISA case regarding continuing denial of monthly benefits); In re Fruehauf Trailer Corp., 250 B.R. 168, 203 (D. Del. 2000) (finding that the test for whether subsequent acts fall under the continuing violations theory is "whether each overt act results in a new injury to the plaintiff"); Arakelian v. Nat'l W. Life Ins. Co., 680 F. Supp. 400, 403 (D. D.C. 1987) (continuing violations do not toll statute of limitations).

accountant. The record supports Watlow's argument. Twenty-six years before he filed suit, Jordahl met with his accountant and discussed the ramifications of his employment classification. Jordahl testified that he learned that Watlow was withholding nothing for Social Security or pension benefits. Further, sixteen years before he filed suit, Jordahl invested in a retirement pension plan available only to self-employed persons. While Watlow considered reclassifying their field sales personnel, Jordahl argued strongly to them in an undated memo for the sales personnel to keep their independent contractor status because "[w]e will not be allowed the continuation of our present Keough [sic] plans which allow high dollar amounts to be contributed. The maximum allowable contribution into Watlow's plan will not be sufficient for me to meet my retirement goals." (Jordahl depo. exh. 32.) The evidence clearly shows that Jordahl understood the financial consequences – including providing for his own retirement benefits – of his alleged misclassification well within the limitations period. Because he waited until 2001 to file suit, the limitations period has run and his claim is time-barred. Watlow's motion for summary judgment (doc. #20) must therefore be **GRANTED**.

## IV.     CONCLUSION

For the foregoing reasons, Watlow's Motion for Summary Judgment (doc. #20) is **GRANTED**.

IT IS SO ORDERED.

s/Susan J. Dlott
Susan J. Dlott
United States District Judge

**Page 593**

1  MS. WYMORE: Let's have this marked as
2  Exhibit 38.
3  (Whereupon, Defendant's Exhibit 38 was
4  marked for identification purposes.)
5  Q    Have you seen this exhibit before,
6  Mr. Jordahl, this document?
7  A    I believe so, yeah.
8  Q    What is this?
9  A    It's a -- it's an annuity.
10 Q    Is this a bid for an annuity or is it
11 one that you have actually purchased?
12 A    No. It's a quote.
13 Q    It's a quote.
14 A    Right.
15 Q    This was prepared it looks like by Roger
16 Kahle?
17 A    Uh-huh.
18 Q    Is that correct? Who is Roger Kahle?
19 A    He's an insurance person at Pacific
20 Life.
21 Q    How did Mr. Kahle come to prepare this?
22 A    I believe my consultant had requested
23 that he do so.
24 Q    So this was not something you asked

**Page 594**

1  Mr. Kahle to do; is that correct?
2  A    I know Mr. Kahle, but the
3  communications, I believe, was between my counsel's office
4  and Mr. Kahle.
5  Q    And you stated that you did not purchase
6  this annuity?
7  A    No.
8  Q    For what purpose did Mr. Kahle prepare
9  this quote?
10 A    It was a reverse -- I won't say the
11 word. Scratch that. It was a method of determining what
12 the value of Watlow's pension plan would have been had I
13 invested in the Watlow annuity from the day I started.
14 Q    And so this was how you purport to
15 measure damages in this case; is that correct?
16 A    Yes. To my understanding, yes.
17 Q    Did Mr. Kahle take into account any set
18 off based on the amount that you have earned through your
19 keogh plans?
20    MR. DORSEY: I'm going to object to that
21    on the basis of foundation, but you can answer if
22    you know.
23 A    I don't know what he's done here. As a
24 matter of fact, I don't believe I've actually reviewed this

**Page 595**

1  document. So I don't know what it's done, but my assumption
2  is he had not.
3  Q    Your assumption is that he had not, but
4  you do not know for sure; is that correct?
5  A    I really don't know what was discussed
6  between my counsel's office and Mr. Kahle.
7  Q    Had you presented him with the
8  information pertaining to your keogh plans?
9  A    No.
10 Q    Had you at the time that this quote was
11 prepared given your attorneys the information regarding your
12 keogh plan?
13 A    I don't know. No.
14    MS. WYMORE: I can't ask you.
15    MR. DORSEY: You can ask.
16 A    I don't think so --
17 Q    Okay.
18 A    -- but --
19 Q    Now, you do have a keogh plan, correct?
20 A    Yes.
21 Q    When did you first start contributing to
22 your keogh plan?
23 A    I can't -- I can't answer that for sure,
24 but as soon as I -- you know, at some point in my career

**Page 596**

1  with Watlow I've obtained enough money to be able to
2  contribute and I'm not sure when that was. Maybe in the
3  '80s.
4  Q    Do you have only one retirement plan
5  that you have been contributing to?
6  A    I have a small SEP also, but that's not
7  related to this.
8  Q    So you only have the one keogh, it's not
9  split among different --
10 A    No.
11 Q    Okay.
12 A    There's a --
13    MS. WYMORE: Let's have this --
14 Q    You know, hold on and we'll lay a
15 foundation for the questions.
16    MS. WYMORE: Let's have this marked as
17    Exhibit 39.
18    (Whereupon, Defendant's Exhibit 39 was
19    marked for identification purposes.)
20 Q    Have you seen this document before?
21 A    Yes.
22 Q    What is it?
23 A    It's a December 31st, I believe,
24 statement from 2001 in my profit sharing plan.

EXHIBIT B

Page 597:

```
 1    Q    Is the profit sharing plan the only
 2  keogh you have?
 3    A    Keoghs are in two pieces, but the -- the
 4  other is called a money purchase plan is my understanding
 5  and the money purchase plan is -- it's debunked, it's
 6  closed.
 7    Q    It's closed?
 8    A    Well, there wasn't much in there to
 9  close. It was never used.
10    Q    During what period of time did you have
11  a money purchase plan?
12    A    I'm going to say the last -- I'm just
13  guessing -- four or five years. I'm not sure. They're no
14  longer used.
15    Q    When was it closed? When was that plan
16  closed?
17    A    It would have been closed this last
18  year.
19    Q    And were there assets in that plan?
20    A    A little bit. Not much, just a
21  fraction.
22    Q    Had it been drawn down? Did there used
23  to be more assets in that plan?
24    A    No.
```

Page 598:

```
 1    Q    What happened to the assets in that
 2  plan? Were they transferred into this plan?
 3    A    It was -- it was taken as income and I
 4  spent it. Is that what you're --
 5    Q    We have not received those documents,
 6  correct, regarding the money purchase plan?
 7    A    You're certainly welcome to have it.
 8  It's irrelevant in the scope of things, but you're certainly
 9  welcome to have it.
10    Q    Now, was there also any kind of keogh
11  pension plan that you were you contributing to?
12    A    That was it.
13    Q    This profit sharing plan?
14    A    That is the keogh.
15    Q    So there was this and there was the
16  keogh money purchase plan.
17         MS. WYMORE: And I would like to get
18         those documents.
19    Q    Now, I know that you said that you think
20  this was for the period December 31, 2001. I just got these
21  documents from your counsel a couple of days before. Well,
22  actually, I was flying here when they arrived at my office.
23  So bear with me. I believe that there are three documents
24  in one here.
```

Page 599:

```
 1         MS. WYMORE: And maybe we can just
 2         stipulate, Ned, that what you have produced are
 3         the profit sharing plan reports essentially for
 4         December 31, 2001, December 31 --
 5    A    Maybe the other one is in here. I don't
 6  know. I think money --
 7    Q    There's one for December 31, let's see,
 8  2002. This also says profits sharing plan.
 9    A    These are the last three years.
10    Q    Of just the profit sharing plan,
11  correct?
12    A    Right.
13    Q    2001, 2002 and 2003. And it reflects
14  that in 2001 the value of the profit sharing plan on
15  December 31st, 2001 was $840,079; is that correct?
16    A    Yeah.
17    Q    And, let's see --
18    A    Excuse me. I should have said yes.
19    Q    I want to say there's a date on here
20  that tells you when you first started contributing.
21         MR. DORSEY: If you look at the first
22         page, there's a date right there after
23         Mr. Jordahl's name. I'm not sure if that's the
24         date.
```

Page 600:

```
 1         MS. WYMORE: Is that the 1982 date?
 2         MR. DORSEY: 1985, 12/17/85.
 3    Q    12/17, 1985 is consistent with when you
 4  think you began contributing?
 5    A    That would be my best guess. That's
 6  probably a good number.
 7    Q    Right. This would be an opening payment
 8  to PaineWebber, correct?
 9    A    I'm sorry?
10    Q    This account -- let me take a step back.
11  This says "UBS PaineWebber Retirement Account," correct?
12    A    Yes.
13    Q    Did you have -- were you funding any
14  keogh prior to when you opened this account with
15  PaineWebber?
16    A    No.
17    Q    So there was no other company to which
18  you have made contributions toward a keogh plan?
19    A    I'm sorry. No.
20         MR. DORSEY: You mean no other broker?
21    Q    No other broker?
22    A    No, I haven't. I don't believe it's
23  allowed to have more than one.
24    Q    I'm not saying simultaneously. I'm
```

1  saying prior to when you opened this account in or about
2  December 1985, had you previously had an account that then
3  was rolled over and transferred?
4    A    I don't think so. I don't remember
5  having any other accounts.
6    Q    Do you know? Would you have records
7  that would reflect that or would your accountants?
8    A    I wouldn't know. I mean, maybe I had an
9  IRA the first year and they rolled it into this keogh. I
10 don't know. It's not likely. I was putting too many kids
11 through college.
12   Q    Then if you look at the sixth page of
13 this exhibit, does this reflect the statement of value of
14 this account on December 31, 2002 in the amount of
15 $720,129.48?
16   A    Yes.
17   Q    And then if you go another six pages, is
18 this the statement of account of this profit sharing -- of
19 your profit sharing plan with PaineWebber effective December
20 31, 2003 showing a value of $900,409.03?
21   A    Yes.
22   Q    Sitting here today, can you ballpark for
23 me the amount of money that you withdrew from the money
24 purchase plan?

Page 601

1    A    My -- it was under $20,000.
2    Q    Was there ever more than that in that
3  account?
4    A    No, never. And it's become illegal, I
5  believe, to have one now. It's not advised.
6    Q    Prior to the financial year 2001, did
7  you pull any money out of the profit sharing plan?
8    A    All withdrawals are shown on the
9  portfolio summary.
10   Q    In prior years?
11   A    Oh, before this?
12   Q    I'm not talking about 2001. There was
13 any time --
14   A    No.
15   Q    -- that you have pulled money out of
16 this profit sharing account other than what would be
17 reflected in the document in front of me?
18   A    No. To clarify, I'm 61 and a half and I
19 could not start withdrawing until 59 and a half. So you're
20 seeing everything that occurred from 59 and a half on. I
21 wasn't allowed to withdraw before.
22   Q    You can still do it, though, with
23 penalties, correct?
24        MR. DORSEY: Very foolishly.

Page 602

1    A    Yeah.
2    Q    And my question is did you pull anything
3  out prior to this?
4    A    No. No.
5    Q    Do you have the statements regarding
6  this account prior to the plan year 2001?
7    A    I can get them, but I don't have them.
8        MS. WYMORE: I would like those
9     documents. I think they have been requested in
10    discovery. Also the SEP statements, I think we
11    requested those in discovery as well and whatever
12    documents --
13       MR. DORSEY: What do you mean -- sub
14    statements, what do you mean?
15       MS. WYMORE: SEP statements, S-E-P.
16   A    There are -- I will say that they're
17 somewhat irrelevant in the scope of things, but I would be
18 glad to furnish those for you.
19   Q    Now, this plan that you have contributed
20 to that was valued in December at close to a million dollars
21 was only available to you because you were self employed
22 during the period of the contributions, correct?
23       MR. DORSEY: Objection to the extent it
24    calls for a legal conclusion. You can answer to

Page 603

1     the extent of your knowledge.
2    A    I don't know that to be fact. It is my
3  understanding at this point in time that there are other
4  alternatives, you know, other than a keogh plan to put money
5  in. I don't know.
6    Q    But that's not my question. My question
7  was not whether there were other things you could put your
8  money in, but whether that you had the ability to fund a
9  keogh only because you were self employed during the period
10 that you've been putting money in?
11       MR. DORSEY: Same objection.
12   A    The legalities of it I don't know.
13   Q    I'm not asking for the legalities, for
14 your legal opinion, I'm asking for your understanding based
15 on fact.
16   A    I can't give you a statement based on
17 fact, I can give you my understanding. My understanding is
18 that having been classified as an independent contractor
19 allows me to -- since Watlow was not contributing, I can
20 contribute.
21   Q    That was because you were self employed,
22 correct?
23   A    Yeah, basically because Watlow did not
24 contribute, I can contribute.

Page 604